# In the United States Court of Federal Claims

### Nos. 14-397L, 15-194L
### (Filed: August 31, 2021)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

GLORIA J. JACKSON, et al., and
MARK FREDERICK GUENTHER,
et al.,

            **Plaintiffs,**

    **v.**

THE UNITED STATES,

            **Defendant.**

* * * * * * * * * * * * * * * * * * * * * * * * * * *

**Fifth Amendment Taking; National Trails System Act; 16 U.S.C. § 1247(d); Just Compensation; Valuation; Expert Witness Credibility; Admissibility of Exhibit After Trial; Interest Rate Appropriate for Just Compensation.**

Mark F. (Thor) Hearne, II and Stephen S. Davis, True North Law LLC, 112 South Hanley Road, Suite 200, St. Louis, MO 63105, for Plaintiffs. James H. Hulme and Laurel LaMontagne, Arent Fox LLP, 1717 K Street, N.W., Washington, D.C. 20006, for Plaintiffs. Lindsay S.C. Brinton and Meghan S. Largent, Lewis Rice LLC, 600 Washington Avenue, Suite 2500, St. Louis, MO 63130, for Plaintiffs.

Jeffrey H. Wood, John C. Cruden, Jean E. Williams, Jeffrey B. Clark, Lucinda Bach, and Amarveer Brar, United States Department of Justice Environment & Natural Resources Division, Natural Resources Section, P.O. Box 7611, Washington, D.C. 20004, for Defendant. Craig Keats and Evelyn Kitay, Surface Transportation Board Office of the General Counsel, 395 E Street, S.W., Washington, D.C. 20024, Of Counsel.

---

### OPINION AND ORDER

---

**WILLIAMS**, Senior Judge.

    This Fifth Amendment taking case comes before the Court following a trial on damages. Plaintiffs, landowners of 59 properties adjacent to a former railroad corridor in Newton County, Georgia, seek just compensation stemming from the imposition of a recreational trail across their properties. [1]  Because the Government's liability for the taking was established on summary

---

[1]    The Court consolidated this action with Guenther, et al. v. United States, No. 15-194L as all plaintiffs are landowners in Newton County, Georgia whose takings claims arise out of the

judgment, the only issue before this Court is the quantum of just compensation. Jackson v. United States, 135 Fed. Cl. 436, 472-73 (2017). Plaintiffs seek $1,410,594, representing $636,311 for the encumbrance of the trail and $774,292 in severance damages, plus interest.[2] Defendant asserts that compensation should be $413,051. For the reasons set forth below, the Court adopts the valuations of Plaintiffs' expert, making adjustments due to the erroneous pricing of a comparable property sale that affected 10 properties.

Also at issue is the proper interest rate to provide Plaintiffs with just compensation given the delay between the date of the taking and the date of payment. Plaintiffs argue that the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds provides the appropriate rate, while Defendant asks the Court to apply the statutory interest rates in the Declaration of Takings Act, 40 U.S.C. § 3116. For the reasons explained below, the Court applies the Moody's Composite Index interest rate.

### **Findings of Fact**[3]

On August 19, 2013, the Surface Transportation Board ("STB") issued a Public Use Condition and a Notice of Interim Trail Use ("NITU") authorizing a "rail-to-trail" conversion of a 14.9-mile railroad right-of-way between Mileposts E 65.80 near Newborn and E 80.70 near Covington in Newton County, Georgia. Plaintiffs' land abuts this right of way, and the conversion

---

same August 19, 2013 Notice of Interim Trail Use. There were initially 63 properties at issue. The Court stayed this matter as to four properties that were inside the boundaries of the original NITU, but outside the boundaries of the corrected NITU, pending an appellate ruling. Following the Federal Circuit's issuance of Caquelin v. United States, 959 F.3d 1360, 1362 (Fed. Cir. 2020), the Court lifted the stay, and severed the claims of Plaintiffs Hardeman, Jackson, Hart, and Sanford. ECF No. 361 at 1; ECF No. 364 at 11, 17-18. The parties subsequently settled the takings claims of these four Plaintiffs. ECF No. 396.

[2]   Plaintiffs recognize that there is a $9.00 disparity between their total damages demand and its two component parts. Plaintiffs explain:

> The landowners' post-trial brief . . . included the correct total compensation of $1,410,594 but included incorrect component totals for the amount of land value and severance damages. . . . The correct amount of land value, per [Plaintiffs' valuation expert, Mr.] Hodge's appraisals and testimony, is $636,311, and the correct amount of severance damage is $774,292 . . . Adding land value and severance results in a total of $1,410,603, which is $9 more than the total referred to in the landowners' post-trial briefing of $1,410,594. This $9 difference is due to a $1 difference in the appraised valuation listed for nine properties.

ECF No. 362 at 2, n.2.

[3]   These findings of fact are derived from the record developed during a three-day trial on damages. Prior to trial, the Court conducted a site visit of 13 of the landowners' properties with counsel for both parties. Additional findings of fact are in the Discussion section. The Court uses "PX" and "DX" to designate exhibits admitted during trial and "Tr." to cite trial testimony. The Court does not correct grammatical errors in quotations from the record.

resulted in a recreational trail easement on Plaintiffs' properties.  No railroad traffic has moved over this railroad line since 2010.  Sec. Am. Compl. Ex. 1 at 7; Tr. 362.

In a Rails-to-Trails case, a taking occurs when "state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004).  "The Trails Act prevents a common law abandonment from being effected by the conversion of the railroad right-of-way to an interim trail use, thus precluding state law reversionary interests from vesting."  Rogers v. United States, 90 Fed. Cl. 418, 428 (2009), aff'd, 814 F.3d 1299 (Fed. Cir. 2015).  If standard abandonment occurred, the right-of-way would revert to the landowner who had granted the railroad an easement for railroad purposes only.  Rogers, 90 Fed. Cl. at 428.  By preventing this reversion and creating a new easement for a new recreational trail, the Government effected a taking pursuant to the Trails Act.  See Preseault v. United States, 100 F.3d 1525, 1550 (Fed. Cir. 1996); Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir. 2006).

As the Federal Circuit has explained:

Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act . . . We concluded that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way." . . . Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

Barclay, 443 F.3d at 1373 (quoting Caldwell, 391 F.3d at 1233-34 (emphasis in original)).  Here, Plaintiffs' properties were taken when the STB issued the August 19, 2013 NITU converting the railroad easement to a recreational trail and preventing the property interests from reverting to Plaintiffs.  After the STB authorized the conversion, the railroad tracks and ties were removed.  Tr. 363.  A portion of the rail corridor was converted into the "Cricket Frog Trail", a paved concrete recreational trail measuring approximately eight feet wide.  Tr. 38, 375.  Other portions of the rail corridor remain unpaved with a gravel covering.  Tr. 117-18.

Landowners whose properties abut the trail testified that noise and traffic increased due to the trail and reported instances of trespass and property damage.  Tr. 39, 41, 81, 105, 120.  Plaintiff-landowner Robert Dew testified that "traffic has certainly picked up, and the noise certainly has picked up" since the trail was paved.  Tr. 41.  Plaintiff-landowner James W. Johnson testified that persons drive automobiles and all-terrain vehicles "all the time" on the trail, despite a posted "Dead End" sign.  Tr. 77.  Plaintiff Johnson testified to multiple encounters with trespassers originating from the trail, and stated "I've had many, many threats."  Tr. 81.  Plaintiff Johnson detailed a 2015 encounter with a trespasser who brandished a sawed-off shotgun, stating "that's something you don't forget."  Tr. 105-06.  James K. Johnson, a forest manager for landowner Mary Dixon,[4] testified that the trail corridor raised concerns of "illegal dumping" and "the opportunity for

---

[4]    Mary Dixon passed away after the site visit in this case, and her estate has been substituted as a party Plaintiff.

wildfires."  Tr. 108-09, 119-20.

The 59 subject properties include urban, rural, commercial, residential, agricultural, improved, and unimproved properties in Newton County, Georgia.  PX 217 at 3.[5]  Newton County is located in North-Central Georgia, within the Atlanta-Sandy Springs-Roswell, Georgia Metropolitan Statistical area, and had a population of 99,958 as of April 2010.  PX 1 at 21. Covington is the county seat and largest city in the county, and its diversified economy includes tourism, forestry, agriculture, manufacturing, retail, and service industries.  Id.; PX 217 at 8.  Local employers include General Mills, Bridgestone Golf, Michelin, and Beaver Manufacturing, and many area residents commute to Atlanta for work.  PX 217 at 8.

Covington has a rich cultural tradition and is a popular location for filming movies and television shows.  PX 1 at 21; Tr. 33-34.  Fourteen of the properties are located inside Covington's Historic District which features homes pre-dating the Civil War.  PX 217 at 14; Tr. 33.  Plaintiff Robert Dew described the Covington Historic District as "just a laidback, I call it beloved Hooterville, after the old sitcom in the '60s . . . it's just a nice, safe place to raise kids."  Tr. 35.

## Discussion

### Jurisdiction

The Tucker Act confers jurisdiction on this Court

> to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  Here, Plaintiffs allege takings under the Fifth Amendment of the United States Constitution, which is a money-mandating provision.  Schooner Harbor Ventures, Inc. v. United States, 569 F.3d 1359, 1362 (Fed. Cir. 2009).

### Legal Standards Governing Just Compensation

Just compensation is generally determined by "the fair market value of the property on the date it is appropriated."  Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984).  "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking."  Id. (quoting United States v. 564.54 Acres of Land, 441 U.S. 506, 511 (1979)).  The landowner "is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more."  Olson v. United States, 292 U.S. 246, 255 (1934).  "Just compensation should be carefully tailored to the circumstances of the case, and this determination typically requires expert testimony."  Childers

---

[5]     The parties presented the direct testimony of some experts via exhibits.  Plaintiffs' Exhibit 217 is the direct testimony of Mr. Hodge, and Defendant's Exhibit 94 is the direct testimony of Mr. Sheppard.  Mr. Matthews, Mr. Underwood, and Dr. Neuberger testified at trial, and their reports were admitted into evidence as exhibits.  See PX 144.17 (Matthews); DX 36 (Underwood); DX 26 (Neuberger).

v. United States, 116 Fed. Cl. 486, 497 (2013); Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1368 (Fed. Cir. 2012).

In Rails-to-Trails cases, where the property taken is an easement, "the 'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'" Otay Mesa, 670 F.3d at 1364 (quoting United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961)). The Uniform Appraisal Standards for Federal Land Acquisition, also known as the "Yellow Book," sets forth the standards and methods to be applied in appraisals of land acquired by the federal government. Sears v. United States, 132 Fed. Cl. 6, 12 n.8 (2017), aff'd, 726 F. App'x 823 (Fed. Cir. 2018); DX 5. According to the Yellow Book, all claimed damages must be "supported by actual market evidence," and the amount of compensation due to each landowner is "measured by the owner's loss, not the government's gain." DX 5 at 154, 157.

In addition to the value of the property actually taken, just compensation also includes severance damages, which is the diminution in value in the owner's remaining property resulting from the taking. Hendler v. United States, 175 F.3d 1374, 1383 (Fed. Cir. 1999) ("[J]ust compensation under the takings clause of the Constitution includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking." (internal quotation omitted)); United States v. Grizzard, 219 U.S. 180, 183, (1911) ("When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account."). The Yellow Book states that the United States must include severance damages in just compensation. DX 5 at 154. "Plaintiff has the burden of proof with respect to severance damages and must offer evidence that the remainder lost market value." Childers, 116 Fed. Cl. at 497 (citing Miller v. United States, 223 Ct. Cl. 352, 383–84 (1980)); see also Hendler, 175 F.3d at 1383.

**Appraisals of Subject Properties**

Both parties retained appraisers to value the subject properties before and after the taking and properly used August 19, 2013, the date the STB issued the NITU, as the date of the taking. PX 217 at 1; DX 94 at 19. However, the appraisers disagreed widely on their appraisals of Plaintiffs' properties, both as to appropriate appraisal methodologies and valuation.

**Overview of the Expert Opinions**

In determining compensation for the appropriated corridor, Plaintiffs' expert Mr. Douglas Hodge valued the land encumbered by the easement at 100% of its fee simple value. See, e.g., PX 24 at JACKSON 002474-77. [6] In valuing each corridor, Mr. Hodge used a "sales comparison

---

[6]     The Court admitted Mr. Hodge as an expert in real estate appraisal, valuation, and the method and practice of real estate appraisal. Tr. 169. Mr. Hodge has 34 years of real estate appraisal experience and is currently employed as a Senior Appraiser at Farmers National Company. PX 217 at 4. He is also the owner of Capstone Realty Resources, which provides appraisals and valuation services. Id. at 4. Mr. Hodge has a B.S. in Finance from Ferris State University, and is designated as a Member of the Appraisal Institute (MAI). Id. at 3-4. He has been admitted as an expert in federal and state courts, and has provided expert testimony and/or appraisal services in Rails-to-Trails cases in the Court of Federal Claims, several times on behalf

approach," comparing each individual property with sales of comparable properties and adjusting for differences. PX 217 at 8-10.

In assessing severance damages to the remainder, Mr. Hodge found that for the majority of the properties, the remainders had decreased in value between 2 and 45 percent, and that three properties decreased more due to the trail bisecting the property or preventing assembly with other residential properties. Id. at 12.

Mr. Andrew Sheppard appraised the subject properties for Defendant.[7] Mr. Sheppard also used a sales comparison approach in his appraisals and applied the Yellow Book principles. DX 94 at 18-21. Mr. Sheppard valued the land encumbered by the trail easement at 85% of its fee simple value, based on his opinion that Plaintiffs retain approximately 15% of their fee simple rights in the trail area because they can use the land for planting and parking. Id. at 176, 184. In calculating severance damages to the remainder properties, Mr. Sheppard concluded that no remainder property decreased in value due to the imposition of the trail easement and that no severance damages were warranted. Id. at 21, 189-209. Mr. Sheppard further found that 22 residential subject properties increased in value by $5,000 as a result of trail adjacency. Id. at 157.

In rebuttal, Defendant presented the expert testimony of Mr. John Underwood,[8] who opined that Mr. Hodge failed to analyze what rights Plaintiffs retain in their property encumbered by the easement, failed to support his calculations of severance damages with market evidence, and failed to adequately verify comparable sales data—as required by the Yellow Book. Tr. 563, 566-67, 585-88. Defendant also presented the testimony of Dr. Jonathan Neuberger, an economist,

---

of the Government. Id. at 5-6. Mr. Hodge currently holds a certified general appraisal license in Michigan, and has formerly been licensed as a certified general appraiser in Ohio, Indiana, Illinois, and Colorado. He obtained a temporary license in Georgia in conjunction with his work in this case.

[7]    The Court admitted Mr. Sheppard as an expert in real estate appraisal and valuation. Tr. 412-13. Mr. Sheppard, a longtime Georgia resident, earned a B.A. in real estate from Georgia State University and is a principal in Pritchett, Ball & Wise, Inc., an Atlanta commercial real estate appraisal firm. Tr. 406; PX 94 at 10. Mr. Sheppard is a certified general real property appraiser in Georgia, and is designated as a MAI. PX 94 at 10. He served as the President of the Atlanta-area chapter of the Appraisal Institute in 2017, and has appraised properties for various private and public entities. Tr. 410-11, PX 94 at 10, 40.

[8]    The Court admitted Mr. Underwood as an expert in real estate appraisal and in the Yellow Book. Tr. 556. Mr. Underwood, a Florida resident since 1948, is a certified general real estate appraiser in Florida. DX 36 at US_0003282. He is the president and owner of Appraisal & Acquisition Consultants, Inc., a real estate appraisal and consulting firm which he founded in 1983. Tr. 549. Mr. Underwood was designated as a MAI in 1982, and in 1984 was certified as a MAI with Senior Resident Appraisal (SRA) designation, which denotes competence in appraising single-family and one-to-four unit properties. DX 36 at US_0003282; Tr. 552. Mr. Underwood currently teaches courses on the Yellow Book for the Appraisal Institute, and has published articles on real estate appraisal and given expert testimony in state and federal cases. See id. at US 0003279-81.

who opined that Mr. Hodge's failure to adequately verify comparable sales or adjust comparable sales for changing market conditions, rendered Mr. Hodge's appraisals unreliable based on economic conditions immediately before and during the Great Recession.[9]  Tr. 620-30; DX 26 at US_0002647-49.

In rebuttal to Defendant's appraisal expert Mr. Sheppard, Plaintiffs presented the expert testimony of Mr. C. David Matthews,[10] who disagreed with Mr. Sheppard's opinions that Plaintiffs retain 15% of their fee simple rights in the encumbered land and that 22 properties received a $5,000 "special benefit" due to trail adjacency.  See PX 144.17 at 7.

## Evidentiary Issues

## The Court Rejects Defendant's Challenge to Mr. Hodge's Credibility

Defendant argues that Plaintiffs' appraiser Mr. Hodge made misrepresentations in his temporary appraiser license application in Georgia that undermine his credibility. ECF No. 264 at 79-80.[11]  Under Georgia law, it is unlawful for anyone to engage in "real estate appraisal activity" without "first obtaining an appraiser classification."  Ga. Code Ann. § 43-39A-24 (West).  The Georgia code defines "real estate appraisal activity" as "the act or process of valuation of real estate or real property and preparing an appraisal report."  Ga. Code Ann. § 43-39A-2 (West).

On August 22, 2017, Mr. Hodge signed his initial application for a temporary Georgia license and submitted it on or about August 30, 2017.  DX 46 at HODGES000218-221.  On the application, Mr. Hodge certified "I hereby agree not to engage in, conduct, advertise, or hold myself out as engaging in or conducting the business of a state real estate property appraiser in Georgia until I receive my temporary practice permit."  Id. at HODGES000221.  Prior to applying

---

[9]     The Court admitted Dr. Neuberger as an expert in economics.  Tr. 619.  Dr. Neuberger holds a B.S. in International Relations from Georgetown University, and a master's degree and Ph.D. in Economics from Johns Hopkins University.  Tr. 606.  He is a principal at Economists Inc., a consulting firm providing economic research for litigation and regulatory matters.  Tr. 608-09.  Dr. Neuberger has been qualified to give expert testimony in the Court of Federal Claims, federal district courts, and state courts.  Tr. 609-10.  He is a member of the American Economics Association, has published articles and taught courses on economics and finance.  Tr. 613-15.

[10]    The Court admitted as Mr. Matthews as an expert in appraisal practice, appraisal review, and related land valuation.  Tr. 664.  Mr. Matthews graduated from the University of Tennessee with a degree in real estate.  Tr. 644-45.  He holds the MAI with SRA, CRE (Counselor of Real Estate), and GRS (general appraisal reviewer) designations from the Appraisal Institute.  Tr. 645. He is the owner and principal of David Matthews Associates, a firm providing appraisals of rural and urban properties, including easements in several Rails-to-Trails cases.  Tr. 647.  At the time of trial, Mr. Matthews was a licensed real estate appraiser in Georgia, Indiana, Kentucky, Iowa, and Florida.  Tr. 649.  He has provided expert testimony in the Court of Federal Claims and other federal and state courts.  Tr. 648-49.

[11]    Defendant filed a motion in limine, arguing that Mr. Hodge's "material misstatements" in his original temporary license application warranted exclusion of his appraisal testimony.  See ECF No. 196 at 13-14.  The Court denied this motion.  ECF No. 217.

for or receiving his temporary license, Mr. Hodge had traveled to Newton County from August 9-11, 2017, where he performed inspections of the subject properties, visited the Newton County Tax Assessor's Office, and met with some Plaintiff-landowners in connection with his appraisals in his case.  Tr. 156-57.

On August 31, 2017, the Georgia Real Estate Appraisal Board returned Mr. Hodge's temporary license application unprocessed, as the Board had not received Mr. Hodge's required criminal background report.  See DX 46 at HODGES000218; Tr. 163.  The Board asked him to submit his criminal background report, additional materials, and pay an "incomplete application fee."  DX 46 at HODGES000228.  Mr. Hodge resubmitted his application with the requested materials and fee on September 26, 2017, and received his temporary license in January 2018.  Id. at HODGES000223; Tr. 160, 162, 167. [12]   Mr. Hodge's appraisal reports are dated between September 2017 and February 2018.  See PX 29 at JACKSON 002890 (dated September 18, 2017); PX 38 at JACKSON 003769 (dated September 19, 2017); PX 43 at JACKSON 004143 (dated October 3, 2017); PX 9 at JACKSON 0006349 (dated February 1, 2018).  Mr. Hodge had his temporary Georgia real estate appraisal license when he rendered his opinions via his written direct testimony on April 20, 2018.  Tr. 167-69; PX 217 at 1.

At trial, Mr. Hodge was asked whether he understood that he was holding himself out as a Georgia state real estate appraiser when performing inspections of Plaintiffs' properties from August 9-11, 2017, prior to receiving his temporary appraisal license.  PX 217 at 4; Tr. 155-61, 167-68.  Mr. Hodge testified that he was not engaging in the business of a Georgia state real estate appraiser because he was rendering opinions in this case -- not working as a Georgia state real estate appraiser.  Specially, Mr. Hodge testified:

> MR. HEARNE (COUNSEL FOR PLAINTIFFS):   Did you understand that you were holding yourself out in the context of a real estate transaction in Georgia as a state real estate appraiser?
>
> MR. HODGE: No.
>
> MR. HEARNE:      In this engagement?   What did you understand this engagement to be?
>
> MR. HODGE: This was a – a federal case to determine the damages and the loss in property value as a result of a federal taking, not a state taking.
>
> MR. HEARNE:      Did you understand that it was in connection with any state real estate transaction in the State of Georgia?
>
> MR. HODGE: There was no state transaction involved.

Tr. 164-65.  Defendant's counsel questioned Mr. Hodge on voir dire about the timing of his license and his understanding of Georgia state law but did not lodge a formal objection to admitting Mr. Hodge.  The Court found that Mr. Hodge's interpretation of the Georgia Code did not affect his

---

[12]      Mr. Hodge's criminal background report showed no criminal history.   DX 46 at HODGES000224-26; see Tr. 162.

qualifications as a real estate appraiser and admitted Mr. Hodge as an expert.

Defendant argues that Mr. Hodge's testimony lacked credibility because he inaccurately certified that he would not engage in the business of a state real estate appraiser in Georgia until he received his temporary license. Defendant contends that when Mr. Hodge inspected properties in this case prior to receiving his permit, he was engaging in the business of a George real estate appraiser.

In this Court's view, Mr. Hodge reasonably believed that because his work in this case did not involve any real estate transaction in Georgia -- no actual purchase or sale -- but rather a valuation for federal litigation purposes, he was not engaging in the business of a state real estate appraiser in Georgia. While Mr. Hodge's belief in this regard may have been incorrect, Defendant has not established that any error in his interpretation of the Georgia Code has impacted his credibility as an appraiser.[13]

## The Admissibility of PX 144.18

Although it is late in the game for the Court to be resolving an evidentiary matter, the parties dispute whether the addendum to Mr. Matthews' expert report rebutting the opinions of Mr. Sheppard, PX 144.18, should be in evidence. Plaintiffs did not seek to admit PX 144.18 into evidence during trial or at the time they filed their post-trial brief. ECF No. 265 at 103, n. 1. Subsequently, at the beginning of closing arguments, Plaintiffs' counsel asked the Court to admit the addendum into evidence, stating that their failure tender the exhibit during trial was an oversight, and that it was clear at trial that "everybody knew that that exhibit was what Mr. Matthews was testifying to." Tr. 805. Defendant objected, arguing that it would be prejudiced by the admission of the addendum. ECF No. 328.

PX 144.18 consists in large part of a 29-page Trail Study labeled "Example of Proper Methodology to Extract Proximity Benefit or Damage Created By A Hiking/Biking Trail In the Rear of a Single Family Residence" made up of seven analyses of Georgia property sales of varying age, lot size, and proximity to a trail corridor, occurring from approximately March 2006 to December 2016. PX 144.18 at JACKSON 004810-13. The addendum also includes approximately 14 pages of graphs and charts synthesizing Mr. Matthew's analysis of Mr. Sheppard's report as well as information about the Case-Shiller Index. Id. at JACKSON 004794-808.

The description of the Trail Study in the addendum states:

A study was made to determine if the presence of a hiking and biking trail has a beneficial effect on the market value of abutting single family residential lots; has

---

[13]     Whether or not Mr. Hodge actually engaged in the business of a state real estate appraiser in Georgia by inspecting the properties in this case is a matter within the purview of the Georgia licensing authorities. There is no evidence suggesting that a representative of the state of Georgia ever communicated any concerns regarding Mr. Hodge's representations in his temporary license application. DX 46 at HODGES000224-26; Tr. 163. If Georgia officials found Mr. Hodge had materially misrepresented information in his application, they could have suspended or revoked his permit. Ga. Code Ann. § 43-39A-14(d) (West).

no effect; or has a negative effect on market value. The methods used for this study involved finding sales of residential properties that abut a trail or other transportation corridor and comparing those sales with sales of similar property that do not abut a trail or other corridor.

Id. at JACKSON 004810.   According to Mr. Matthews, the Trail Proximity Damage Study provides an example of the proper methodology using seven analyses to extract benefit or damage created by a trail in the rear of a single-family residence as an alternative to Mr. Sheppard's method.  Id. at JACKSON 004810-11.  The methodology used in this study "involved finding sales of residential properties that abut the trail or other transportation corridor and comparing those sales with sales of similar property that do not abut a trail or other corridor."  Id. at JACKSON 004810.   No comparable trails were found in Newton County or the surrounding areas.   A comparable trail, the Fall Line Trace Trail, was found in Columbus, Georgia.  Five analyses of this trail were conducted, which collected sales that appear to be arm's length non-bank foreclosure sales along and away from the trail.  Id. at JACKSON 004810-11.

In the addendum Mr. Matthews opined that "[t]he resulting data indicated some consistent trends.   The overwhelming results were that properties abutting the trail did tend to sell for less than homes without a trail in their back yard."  Id. at JACKSON 004810.  Two additional analyses included in the Trail Proximity Damages Study were of properties in Covington that abut other transportation corridors, which "were selected because they suffer loss of privacy in much the same way as the subject parcels."  Id. at JACKSON 004810.   These studies showed that abutment to a trail or transportation corridor caused the remainder parcels to lose 20.5% to 99% of their value with an average of 51.8%.  Id. at JACKSON 004812.   In the addendum to his rebuttal report, Mr. Matthews opined "that the probable loss to the land value [of single-family residences abutting a hiking/biking trail] lies within the range of 25% and 50% with my best estimate in the middle of that range at 33.3% loss."  Id.  Mr. Matthews executed a certification for the addendum in PX 144.18 stating that he "made a personal inspection of the subject of the work under review" and that "no one provided significant appraisal, appraisal review or appraisal consulting assistance" to him.  Id. at JACKSON 004833-34.

Plaintiffs argue that the copy of the addendum used during trial was physically attached to Mr. Matthew's rebuttal report, PX 144.17, admitted at trial, but that this addendum was marked as a separately as Exhibit 144.18 and referenced along with PX 144.17, collectively as "the report."  ECF No. 329 at 8.  The testimony supports Plaintiffs' position:

> MR. HEARNE:        Let me give you an exhibit, if I could, it's Plaintiffs' Exhibit 144.17.  If I may approach, Your Honor?
>
> THE COURT:        Certainly.
>
> MR HEARNE:        And just, your Honor, if I could.
>
> THE COURT:        Yes?
>
> MR. HEARNE:        To simplify the process, I may give this witness, if I could, all of the exhibits I am going to refer to.  Just the ones we've referenced.
>
> THE COURT:        Sure.

> MR. HEARNE:        And ask him to identify these.
>
> MR. MATTHEWS:   This is a copy, a complete copy of my review, rebuttal of appraisal report submitted by Andy Sheppard.
>
> MR HEARNE:        And <u>does that have the addendum attached to it</u>?
>
> MR. MATTHEWS:   Yes, it does.

Tr. 667-68 (emphasis added).  Thus, at trial Plaintiffs' counsel used a copy of Mr. Matthews' rebuttal report, PX 144.17, which had the addendum attached to it, instead of referring to the separately marked addendum in PX 144.18.  Due to this erroneous combination of what should have been two separate exhibits, PX 144.17 and PX 144.18**,** Plaintiffs' counsel only sought to admit PX 144.17 even though counsel referenced both.

Defendant argues that because Plaintiffs did not offer the addendum into evidence at trial, Defendant's counsel modified his cross-examination of Mr. Matthews.  ECF No. 328 at 4.  This argument lacks merit as counsel for Defendant did cross-examine Mr. Matthews on graphs which were present only in the addendum**,** the exhibit that was not admitted.  Tr. 737-39.  The exchange between Defendant's counsel and Mr. Matthews is as follows:

> MR. HARRINGTON (COUNSEL FOR DEFENDANT):    You have a number of graphs <u>in your rebuttal report</u>.  Are those graphs also illustrative, just the way the paired sales analysis you referred to was illustrative?
>
> MR. MATTHEWS:   They were actually an analysis of Mr. Sheppard's resulting value opinions.  I'm trying -- I was trying to understand are they reasonable.  So you'll see a lot of different graphs about his value per acre, his total compensation estimates, before values, a lot of different graphs for me to help understand or to understand better what he did and why he did it.
>
> MR. HARRINGTON: But those are not graphs that you used or you could properly use to come up with alternative numbers?
>
> MR. HODGE: With values, alternative -- no.
>
> MR. HARRINGTON: When you put together the lines on those graphs, you simply used Excel's built-in formulas to develop those graphs.  Isn't that right?
>
> MR. MATTHEWS: Yeah.  My understanding of the statistics goes no further than that.

Tr. 737-39 (emphasis added).  Defendant's counsel's reference to the "number of graphs" in what he called Mr. Matthews' "rebuttal report" indicates that, at trial, counsel for Defendant, like counsel for Plaintiffs, referred to the addendum as "the rebuttal report" and viewed the report and addendum collectively.  There are no graphs in Mr. Matthews' rebuttal report, the exhibit that was admitted, PX 144.17.  Given that Defendant's counsel did cross-examine the opposing expert on

the graphs in the addendum and had the opportunity to inquire about the Trail Study if he had chosen to during trial, Defendant will not be prejudiced by admitting the addendum.[14]

Taking into account the instances at trial where counsel for both parties and Mr. Matthews refer to the report and addendum collectively, the fact that the addendum was physically attached to the rebuttal report at trial, that counsel for Defendant cross-examined Mr. Matthews on graphs that were present only in the addendum, and counsel for both parties proceeded as though the addendum was in the record, the Court admits PX 144.18 into the record, nunc pro tunc.

### The Property Rights Plaintiffs Retain in the Land Taken by the Easement

In Mr. Hodge's view, the subject property owners retain virtually no rights in the encumbered land, and thus each of his "after" valuations assumed the Government had taken a fee simple interest in the encumbered portion. Tr. 181-82, 219-23. Mr. Hodge reached his conclusion that the easement extinguished virtually all of Plaintiffs' property rights in the encumbered parcel by comparing the trail easement's impact on the property owners' ability to use the encumbered land with impacts caused by other types of easements. Tr. 219-20.

In Mr. Sheppard's opinion, each Plaintiff retains 15% of the property rights in the encumbered land, and his appraisals award each owner compensation for 85% of the encumbered land's fee simple value. DX 94 at 183-84. In arriving at this conclusion, Mr. Sheppard relied upon a matrix on easement valuation detailing other types of easements, appearing in an article by Mr. Donald Sherwood from the May/June 2006 edition of Right of Way magazine, reproduced below:

---

[14]    Defendant's counsel also claims prejudice because he did not call a sur-rebuttal witness, Dr. Neuberger, once Plaintiffs elected not to introduce the addendum into evidence, stating:

> [S]ur-rebuttal expert, Dr. Neuberger, was present in court and prepared to testify in detail about the inappropriateness of using the Atlanta Case-Shiller Index for valuation of Newton County real estate; numerous flaws in Mr. Matthews' "graphical methodology" for purportedly identifying appropriate adjustments for size and location, as well as in Mr. Matthews' trail proximity study included in PX 144.18. Because Plaintiffs elected not to introduce PX 144.18, the United States chose to forego aspects of its planned cross-examination of Mr. Matthews and there was no reason to call Dr. Neuberger as a sur-rebuttal witness. Consequently, Dr. Neuberger did not testify at all.

ECF No. 328 at 4. Counsel's argument that he was poised to call Dr. Neuberger but opted not to because Plaintiffs had not introduced the addendum into evidence falls flat, as Defendant's counsel's conduct during trial indicated that he believed that the addendum had been admitted. Tr. 737-39.

**EASEMENT VALUATION MATRIX**

| Percentage of Fee | Comments | Potential Types of Easements |
|---|---|---|
| 90% - 100% | Severe impact on surface use Conveyance of future uses | Overhead electric Flowage easements Railroad ROW Irrigation canals Access roads |
| 75% - 89% | Major impact on surface use Conveyance of future uses | Pipelines Drainage easements Flowage easements |
| 51% - 74% | Some impact on surface use Conveyance of ingress/egress rights | Pipelines Scenic easements |
| 50% | Balanced use by both owner and easement holder | Water or sewer lines Cable line Telecommunications |
| 26% - 49% | Location along a property line, location across non usable land area | Water or sewer line Cable lines |
| 11% - 25% | Subsurface or air rights that have minimal effect on use and utility Location with a setback | Air rights Water or sewer line |
| 0% to 10% | Nominal effect on use and utility | Small subsurface easement |

DX 94 at 183.

Mr. Sheppard viewed this matrix as a "general guide for the impact or allocation from fee simple value a host of typical easement types may have on the total bundle of rights" held by a property owner. Id. Mr. Sheppard concluded:

> As seen on the matrix, a percentage of fee-simple value for the affected easement area ranges between 75% and 89%, considering the severity of impact on the surface's use . . . The trail easement was not considered to be as onerous as overhead transmission lines, access roads, or railway right-of-way, because there is no aesthetic quality lost as a result of the trail, vehicles are precluded from using the trail, and there is no expectation that rail cars will use the trail. I conclude, however, that an appropriate percentage is toward the higher end of the 75% to 89% range, at 85%.

Id. at 184.

The Court finds that Mr. Sheppard's opinion that these Plaintiff owners retain 15% of their property rights in the land encumbered by the trail is unsupported by the evidence and contrary to caselaw. At the outset, Defendant failed to establish that the Sherwood matrix is a persuasive indicator of the owners' property rights in land encumbered by a Rails-To-Trails easement.

13

Plaintiffs' expert, Mr. Matthews, articulated the pitfalls of relying on this matrix, stating:

> One of [Mr. Sheppard's] two primary support sources for the 15% remaining value is a chart an appraiser published in the 2006 publication of the Right of Way magazine. I subscribe to that magazine as a member of IRWA. I am sure the author, Don Sherwood, would not approve of an appraiser using his chart to value dozens of properties in a [Rails-to-Trails] appraisal. Sheppard states this is a general guide. I disagree with several of Mr. Sherwood's generalizations by category and value of rights taken based on my extensive experience in appraising corridor easements acquisitions. While there may be some benefit to appraisers in helping them better understand the influence of various types of easements, the use of this as primary valuation support in a condemnation proceeding is inappropriate.

PX 144.17 at JACKSON 004739. Mr. Matthews' critique of Defendant's reliance on the Sherwood matrix is persuasive. Recreational trail easements do not even appear on the matrix. DX 94 at 183.

But even if the Sherwood matrix could provide some guidance here, it does not support Mr. Sheppard's conclusions. Under the Sherwood matrix, access road easements, the most similar easements to the trail, are considered to have a "severe impact on surface use," and are assessed a 90-100 "percentage of fee" -- not an 85% of fee. Id. As Mr. Matthews opined, "[f]rom this list of restrictive easements the top category at 90% to 100% of the fee value fits much better," as these easements do not "allow the land owner to use the land for private use." PX 144.17 at JACKSON 004739. In categorizing trail easements in the Sherwood matrix's zone of 75-89% of fee value, along with pipeline, drainage, and flowage easements, Mr. Sheppard ignored the Plaintiff property owners' inability to exclude the public from their land. Id.; see Tr. 462-64, 472; Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (describing the right to exclude others as "one of the most treasured strands in an owner's bundle of property rights."). In listing the uses that the property owners could still make of the encumbered trail corridor Mr. Sheppard merely referenced rights enjoyed by the general public such as walking or biking and proximity to the trail. Tr. 480-81. Rights held by the general public, however, are clearly not rights that define individual property ownership. See United States v. Craft, 535 U.S. 274, 278 (2002).

Mr. Sheppard's conclusions that "there is no aesthetic quality lost as a result of the trail" and "no expectation that rail cars will use the trail," contradict the testimony of credible witnesses who observed the impact of the trail firsthand as well as the legal import of rail-banking. DX 94 at 184. Plaintiff Robert Dew testified that noise and traffic had "certainly picked up," since the trail was constructed, and Plaintiff James W. Johnson testified that people drive automobiles and all-terrain vehicles on the trail and cited threats and alarming encounters with trespassers coming from the trail, including an incident where a trespasser drew a sawed-off shotgun. Tr. 41, 77, 81, 105-06. Mr. James K. Johnson, the forest manager for a deceased Plaintiff, testified that the trail brought concerns of illegal dumping and increased risk of wildfires:

> There's an ongoing problem of people just backing a truck somewhere in the middle of the night and dumping stuff. And there's actually a mattress and a chair we saw yesterday on the rail corridor and there's places that could be dumped on [the Dixon property] just as easily.

Tr. 119; see Tr. 108-09, 119-20.

Mr. Sheppard's conclusion that there is <u>no</u> expectation that rails cars will ever use the trail contradicts statute and precedent.  Railbanking is a feature of the NITU, and contemplates that the Trail may be converted to railroad or transit use.  See 16 U.S.C. § 1247 (stating that the Trails Act was enacted "in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service"); <u>Caldwell</u>, 391 F.3d at 1229 (stating that the effect of the NITU is that "the STB retains jurisdiction for possible future railroad use"); <u>Birt v. Surface Transp. Bd.</u>, 90 F.3d 580, 583 (D.C. Cir. 1996) ("The rail line . . . retains the right to reassert control over the easement at some point in the future if it decides to revive rail service.").  In sum, Mr. Sheppard's opinion that the owners retain 15% of fee simple ownership is unpersuasive.

In contrast, Mr. Hodge persuasively opined that the property owners retain virtually no valuable rights in the encumbered land, warranting compensating Plaintiffs for the full fee simple value of the encumbered portion of their property.  Tr. 219-23.  Mr. Hodge explained:

> In my appraisal of these properties and in my appraisal of properties in other Trails Act cases I have conducted numerous interviews of property owners, real estate agents, and others in the marketplace.  While some individuals appreciate the presence of a public recreational trail in their community, the overwhelming number of persons I have interviewed all expressed significant concerns about loss of privacy, greater potential for vandalism and increased public access and traffic crossing their property.  It is also important to distinguish the perception of a benefit of a public recreational trail in the community from the burden of a trail across a specific owner's land.
>
> Furthermore, the scope of this new rail-trail corridor easement is not for just a public recreational trail.  The nature of the easement includes the possibility a railroad could be built across this corridor in the indefinite future.  A knowledgeable buyer purchasing the property in the after-taken condition would pay less for the property knowing this.  Common sense, as well as my experience as an appraiser and my interviews with owners, all confirm this point.  I have never encountered a situation where a buyer would pay the same amount for home with a railroad right of- way across a portion of the backyard as for a similar home without a railroad right-of-way.  So too with a public corridor.  It has been my experience as an appraiser that one of the significant features of property (especially residential property) is privacy and the ability to exclude others.  A property encumbered by a public easement that reduces the owner's ability to exclude the public and shield his home from an adjoining public corridor is less valuable than a property that is not encumbered by such an easement.

PX 217 at 12-13.

In Rails-to-Trails cases, the Court has consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel.  In <u>Moore v. United States</u>, 54 Fed. Cl. 747, 751 (2002), the Court held that "the right of way parcel should be diminished 100% in the 'after' analysis because the landowners had no effective remaining use of the property."  See <u>Howard v. United</u>

States, 106 Fed. Cl. 343, 367 (2012) (stating that properties subject to a trail easement "would appear to be lost to the fee holder for all intents and purposes in perpetuity."); see also Childers v. United States, 116 Fed. Cl. 486, 524 (2013);[15] McCann Holdings Ltd. v. United States, 111 Fed. Cl. 608, 626 (2013).

Based upon the record as a whole, this Court concludes that Plaintiffs retain virtually no rights in the encumbered land and awards Plaintiffs 100% of the encumbered land's fee simple value as part of just compensation for the taking.

**The Experts' Methodologies to Value the Property Interests Taken**

The value of the property interest taken in a Rails-to-Trails case is determined using the "before-and-after" method of valuation.  Plaintiffs' expert Mr. Hodge explained:

> The "before-taken" value is the market value of the fee estate assuming the property was unencumbered by the rail-trail corridor easement and each landowner had the right to use and possess their property.  The "after-taken" value is the market value of the fee estate as now encumbered by a new easement for public recreational and a possible railroad in the indefinite future.  The difference between the before-taken and after-taken value is the fair market value of the property rights taken from each owner.

PX 217 at 6-7.  Both Plaintiffs' and Defendant's experts used sales comparison analyses to calculate their before-and-after valuations of the subject properties.  Id. at 6-7; DX 94 at 21.

**Plaintiffs' Expert's Sales Comparison Analysis**

Using the sales comparison analysis method prescribed by the treatise The Appraisal of Real Estate (2013),[16] Mr. Hodge determined the value of the land taken by the easement corridor.

---

[15]    In his report for the Government in another Rails-to-Trails case, Childers, an exhibit in this case, Mr. Underwood opined:

> This permanent easement takes most of the bundle of rights on the property, with the only entitlement remaining that it would be included in the size calculations of the total site for consideration of density/number of dwelling units that could be built on the site.  As a result, it is my opinion that the permanent easement takes 99% of the value of the area encumbered by the easement.

PX 207.2 at 44-45.

[16]    The Appraisal of Real Estate is "a treatise on the subject of appraisals published by the American Institute of Real Estate Appraisers."  Low v. Equity Programs, Ltd., 882 F. Supp. 344, 348 (S.D.N.Y. 1995).  It is "the leading real estate appraisal treatise" and is routinely cited as an authority on matters of real estate valuation.  Appraisal Inst. v. Gallagher, No. CIV.A.3:02-CV-2199-D, 2003 WL 21653861, at *1 (N.D. Tex. Mar. 20, 2003); see McCann Holdings, 111 Fed. Cl. at 615-16.

He first researched recent sales of comparable properties to find properties as similar as possible to the subject property, considering characteristics such as property type, date of sale, size, physical condition, location, and constraints on the use of the land.  PX 217 at 9.  He then verified that the data obtained was factually accurate and that the transactions reflected arm's length market considerations.  Id.  To determine the terms and conditions of prior sales, Mr. Hodge relied on qPublic and on the verification process used by the Newton County Tax Assessor's office.  Tr. 192-93, 299.

Next Mr. Hodge selected "the most relevant units of comparison," such as price per square foot, to try to "identify a unit of comparison that explains market behavior."  PX 217 at 9.  Mr. Hodge cited "time adjustment/market conditions" as an element of comparison reflecting the change in value from the date of sale of the comparable property to the date of valuation if there had been a significant change in market conditions during that timeframe.  Id. at 10.  The date of valuation was the August 19, 2013 date of the taking, and the comparable sale dates ranged from January 31, 2008 to December 11, 2013.  Tr. 254-55; PX 27 at JACKSON 002791; PX 38 at JACKSON 003037.  Mr. Hodge did not make market conditions adjustments to the comparable properties because the country was in the midst of the Great Recession from 2008 to 2013, and lenders were reluctant to lend money during this period; he concluded that property values had been relatively stable over the time frame represented by the comparable data.  PX 217 at 10.

Mr. Hodge identified the type of ownership (such as fee simple, or a leasehold), property location, land size and shape, access to the property, and zoning and land use regulations, as other units of comparison.  Id. at 10-11.  Then, using those units of comparison, Mr. Hodge adjusted the prices of comparable properties to account for any differences between the subject and comparable properties, considering whether adjustments should be made in light of similar, inferior or superior characteristics.  Lastly, Mr. Hodge synthesized "the various value indications produced from the analysis of comparable sales into a value conclusion."  Id. at 10-11.

The comparable sales Mr. Hodge selected were all for fee simple estates, arm's length transactions, and were as similar in size, location, and zoning to the subject property as possible.  Id. at 10-11.  After determining the price per square foot of each of the comparable sales, Mr. Hodge made the adjustments necessary for each individual property in a sales analysis grid.  Id. at 11; see, e.g., PX 14 at JACKSON 001761; PX 29 at JACKSON 002928; PX 38 at JACKSON 003806.  Then, upon finding the proper range of price per square foot for each of the comparable sales, Mr. Hodge interpreted the data to determine the proper price per square foot of the Plaintiff property.  See, e.g., PX 14 at JACKSON 001761-1762.[17]

**Defendant's Expert's Sales Comparison Analysis**

Mr. Sheppard used a sales comparison analysis to calculate his before-and-after valuations of the subject properties.  Mr. Sheppard researched land sales from an undefined "surrounding area," between January 1, 2010 and August 19, 2013, which "yielded over 1,000 recorded transactions," and discarded sales he did not deem comparable, such as bank foreclosures, non-arms-length transactions, or locations "considerably superior or inferior" to the subject properties.  DX 94 at 18-19.

---

[17]     In some instances. Mr. Hodge used the price per acre.

Ultimately, Mr. Sheppard identified the following comparable sales for different categories of properties:

| | | | |
|---|---|---|---|
| Industrial: | 3* Transactions | 9 | Sales Considered Comparable |
| Commercial: | 43 Transactions | 6 | Sales Considered Comparable |
| Residential: | 1,272* ** Transactions | 12 | Sales Considered Comparable |
| Agricultural: | 39 Transactions | 5 | Sales Considered Comparable |

\* Scarcity of sales required searching in adjacent Rockdale County for "gaps" in data from Newton
** 1,052 sales were bulk-lot sales (mostly foreclosed subdivision lots)

DX 94 at 19-20. Mr. Sheppard noted the low number of comparable sales, stating:

> Given the scarcity of truly comparable data, due to the rural/suburban nature of the area and especially in light of a period of low sales volume after the Great Recession, the adjustment process does not yield a more credible result than carefully analyzing each subject property within a known array of sales available by property type, covering a variety of sale-specific, location-specific, physical-specific differences.

DX 94 at 21.

Mr. Sheppard grouped a subject property with sales of comparable properties of the same highest and best use, and then performed a "matched-pair" sales analysis, i.e. a comparison of two sales with similar characteristics except for one overriding difference, in this case proximity to a trail corridor. DX 94 at 20-21, 176; Tr. 296. Using the results of the matched-pair analysis, Mr. Sheppard then adjusted the sale prices.

**Defendant's Challenges to Plaintiffs' Sales Comparison Methodology**

Defendant argues that Mr. Hodge's comparable sales analysis is "flawed and inaccurate" because he failed to comply with the Yellow Book's standards for verifying sales data, and instead relied on publicly-available data on the Newton County Tax Assessor's "qPublic" website. ECF No. 264 at 62, 74, ECF 328 at 9. Defendant claims that for several sales, the qPublic data did not match the details on the underlying deed or contained typographical errors.

The Yellow Book provides that "all comparable sales used must be confirmed by the buyer, seller, broker, or other person having knowledge of the price, terms, and conditions of sale." DX 05 at 25 (emphasis added). Mr. Hodge did not contact individual parties to the comparable sales to confirm the data's accuracy and instead relied on the Newton County Tax Assessor's qPublic data. Tr. 192-93, 208. Mr. Hodge considered the Tax Assessor's data to be adequately verified, as it is derived from documents signed by a party to the transaction or his agent who attests to the veracity of the information "under penalty of law". Tr. 192. Mr. Hodge opined that using the Tax Assessor's data is more reliable than asking the parties involved, sometimes years later, to recall the details of a particular transaction. Tr. 302-03.

The Court finds that Mr. Hodge's reliance upon the qPublic data provided by the Newton County Tax Assessor comported with uniform appraisal practice standards. The Appraisal Institute's Uniform Standards of Professional Appraisal Practice do not require an appraiser to call

parties to a transaction to confirm the sale details. THE APPRAISAL FOUND., 2018-2019 UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP) 38 (2018). The source of the qPublic data is Form PT-61, a formal transfer form, completed by the parties to a sale which is recorded in the Georgia Superior Court, then entered into the County Tax Appraiser's database, and finally entered into the qPublic database.

Georgia regulations require parties to contemporaneously disclose sale data when a property is transferred, in order to assess the appropriate transfer tax, and such disclosure must be made on Form PT-61. Ga. Comp. R. & Regs. 560-11-2-.16(1) (2016). Required sales data includes the seller's identity, date of sale, buyer's identity, the intended use of the property, i.e., residential, agricultural, commercial, or industrial, as well as a "complete description of the property being conveyed," including "the number of acres of property, map and parcel number, district, land lot and sublot and block," and the "actual value of the consideration received by the seller for the real and personal property conveyed to the buyer." Ga. Comp. R. & Regs. 560-11-2-.16(1)(a)-(d).

On the Form PT-61, the "seller or seller's authorized agent" must certify

that all the items of information entered on the transfer form PT-61 are true and correct (to the best of his knowledge and belief) and that he is aware that the making of any willful false statement of material facts will subject him to the provision of the penal law relative to the making and filing of false instruments . . . .

Ga. Comp. R. & Regs. 560-11-2-.16(1)(f).

The Chief Appraiser for the Newton County Tax Assessor's Office, Mr. Corneil Marcus Jordan, testified in deposition that when a property is transferred, a Form PT-61 is typically completed in the office of the transaction's closing attorney, then submitted along with the property's warranty deed to the Clerk of the Superior Court, who sends the form to the Tax Assessor's office where the data from the Form PT-61 is entered into the Newton County Tax Assessor's WinGAP software database. DX 95 at 11-12; 34-36, 49. The "information is pulled" from the Newton County Tax Assessor's database by a third-party entity and displayed on the qPublic website. Id. at 16.

Although Mr. Hodge's reliance upon the Newton County Tax Assessor's data, complied with uniform appraisal standards, consideration is appropriate of alleged errors that may have made their way into the qPublic data. Defendant identified errors in the qPublic data for 10 of Mr. Hodge's 37 comparable sales, including errors in the sale price or acreage. ECF No. 264 at 74-77; PX 217 at 14-41. Upon review of the data and the parties' arguments, the Court concludes that one error involving a wrongly priced comparable adversely impacted Mr. Hodge's valuation.

### The qPublic Data Overstated the Sale Price for One Lot in Comparable Sale No. 3 Due to A Typographical Error

Defendant argued:

Mr. Hodge used comparable sale 3 (9159/9169 Malcolm), in his appraisals of

19

> twelve properties.[18]   Again relying solely on qPublic, he concluded that one lot
> sold for $4,800 and the other lot sold for $48,000 – for a total sales price of $52,800.
> The underlying deed for the sale shows that both properties in fact sold for $9,600.
> The Newton County Tax Assessor's Office admitted that the $48,000 sales figure
> shown on qPublic is simply a typographical error.  Thus, Mr. Hodge significantly
> overstated the actual sales prices by 60-75%.  Tr. 582: 9-583:11; PX 44.

ECF No. 264 at 75.

The qPublic data for 9159 Malcolm Drive, which is 0.11 acres in size, shows a sale price of $48,000 on December 21, 2010, and the qPublic data for 9169 Malcolm Drive, a property of 0.12 acres in size, shows a sale price of $4,800 on December 21, 2010.  PX 44 at JACKSON 004334, 36.  Based on his review of the Form PT-61 for the sales of 9159 and 9169 Malcolm Drive, Mr. Jordan, the Chief Appraiser for the Newton County Tax Assessor's Office, testified that the total purchase price for the two lots was $9,600, that each lot had sold for $4,800, and that the sales price of $48,000 for 9159 Malcolm Drive was "a typo of one too many zeros."  DX 95 at 47, 52, 57, 100, 102.[19]

Due to this error, Mr. Hodge used a price per square foot of $5.27 for the 9159/9169 Malcolm comparable sale, which he found by dividing $52,800, the incorrect sale price because it used $48,000 for 9159 Malcolm, by 10,019 square feet, the size of the combined 9159/9169 Malcolm lots.  However, the price per square foot should have been derived by dividing $9,600, the correct sale price of the combined lots, by 10,019 square feet to yield $0.96 per square foot.  As a result of this error, Mr. Hodge used a price per square foot over five times higher for the combined lots in comparable 3 than the actual price per square foot.

This error is problematic because Mr. Hodge only used two other comparables in reaching his valuations, and neither party addressed the error's effect on valuation.  Using the erroneous comparable which he valued at $5.27 per square foot and two other comparables -- 9179 Malcolm at $5.44 per square foot, 10173 Dinah Circle at $4.35 per square foot, Mr. Hodge valued 10 properties as follows:

| Plaintiffs' Properties | Hodge's Before Valuation | Hodge's After Valuation |
|---|---|---|
| Reginald Henry Property (Parcel 125) | $4.00/sq. ft. | $3.75/sq. ft. |
| Sherman Smith Property (Parcel 132) | $4.00/sq. ft. | $3.75/sq. ft. |

---

[18]     In its Post-Trial Brief Defendant states that Mr. Hodge used comparable 3 (i.e., 9159/9169 Malcolm) in his appraisals of 12 properties citing the transcript and Mr. Hodge's appraisal report for one of those properties.  However, Mr. Hodge's individual appraisal reports indicate that Mr. Hodge only used this property for 10 properties described below.

[19]     Mr. Jordan testified that such errors occur in "less than 1 percent" of the data inputted into qPublic.  DX 95 at 102.

| | | |
|---|---|---|
| Winston Munroe Property (Parcel 162) | $4.50/sq. ft. | $4.25/sq. ft. |
| Rentrope Property (Parcel 164) | $4.50/sq. ft | $4.25/sq. ft. |
| Alcide Property (Parcel 168) | $4.50/sq. ft. | $4.25/sq. ft. |
| Semador Property (Parcel 171) | $4.50/sq. ft. | $4.25/sq. ft. |
| Lockhart Property (Parcel 287) | $4.00/sq. ft. | $3.75/sq. ft. |
| Joseph Marino Property (Parcel 105) | $3.75/sq. ft. | $3.50/sq. ft |
| City of Covington Property (Parcel 123) | 40,004 sq. ft. @ $0.60/sq. ft. and 30,600 sq. ft. @ $3.50/sq. ft. | $3.10/sq. ft. |
| Leonard Goss, Jr. Property (Parcel 152) | $4.50/sq. ft | $4.25/sq. ft. |

PX 217 at 66-67; PX 14 at JACKSON 001759-63; PX 15 at JACKSON 001830-34; PX 21 at JACKSON 002258-62; PX 22 at JACKSON 002329-33; PX 23 at JACKSON 002400-04; PX 24 at JACKSON 00247-75; PX 41 at JACKSON 004035-39; PX 42 at JACKSON 004105-09; PX 43 at JACKSON 004178-82; PX 44 at JACKSON 004315-19.

Defendant asks the Court to conclude that this error along with other errors renders Mr. Hodge's valuations unreliable, and Plaintiffs argue that this error would not have affected Mr. Hodge's valuation.  Neither party attempted to adduce additional evidence or offer meaningful argument on how the Court should assess this error.  See Tr. 858, 962; ECF No. 332 at 15.

Nonetheless, this Court is tasked with awarding Plaintiffs just compensation for the taking of their properties and must arrive at a reasonable assessment of this error's impact on damages. See, e.g., Gadsden Indus. Park, LLC v. United States, 956 F.3d 1362, 1372 (Fed. Cir. 2020) (affirming the trial court's holding that it "may award damages, even if [it] does not fully credit [a] party's methodology").  The Court has discretion in adopting a methodology that awards just compensation to a takings plaintiff.  See generally Otay Mesa Property, L.P. v. United States, 779 F.3d 1315, 1326 (Fed. Cir. 2015) ("We detect nothing inappropriate with the Court of Federal Claims looking at the evidence as a whole and using its own methodology to calculate a damages award."); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 833 (Fed. Cir. 2010) (concluding that the Claims Court did not abuse its discretion by modifying plaintiff's methodology for calculating damages).

It is clear here that Plaintiffs have been injured by the taking.  It is also clear that the error in qPublic operated to inflate the valuations of a comparable property used in determining Plaintiffs' losses.  However, the factors Mr. Hodge applied in valuing each individual property based on the comparables cannot be quantified or replicated by this Court. [20]  Rather, as detailed above, Mr. Hodge exercised his judgment as an appraiser and considered numerous units of comparison including location, land size and shape, access to the property, zoning and land use regulations to adjust the prices of comparables to account for any differences between subject and comparable properties.  PX 217 at 10-11.  As such, for the 10 properties that used the erroneously inflated comparable sale at 9159/9169 Malcolm, the Court adopts Mr. Hodge's damages calculation reduced by 5%.  The Court reduces Mr. Hodge's valuation of the land within the easement for these 10 properties as follows:

| Plaintiffs' Properties | Hodge Damages for Value of Land within Easement | Court Awarded Damages of Value of Land within Easement |
| --- | --- | --- |
| Reginald Henry Property (Parcel 125) | $17,800 | $16,910 |
| Sherman Smith Property (Parcel 132) | $25,700 | $24,415 |
| Winston Munroe Property (Parcel 162) | $11,475 | $10,901.25 |
| Rentrope Property (Parcel 164) | $11,700 | $11,115 |

---

[20]    As noted in one treatise:

It is generally held improper to determine market value on the basis of simple averaging of the sales prices of other properties without any adjustment of such prices for differences between properties.  It seems unlikely, however, that this rule would prohibit the determination of value by computing the weighted average of adjusted prices.  The latter process requires the exercise of expert judgment both in adjusting the compared sales prices and in determining the relative weight to be given to each sale.

5 DANIEL F. SULLIVAN, AM. JUR. PROOF OF FACTS 2d 411, § 8 Determination of value of subject property (2000) (citing Latham Holding Co. v. State, 209 N.E.2d 542, 543 (N.Y. 1965)).

| | | |
|---|---|---|
| Alcide Property (Parcel 168) | $10,125 | $9,618.75 |
| Semador Property (Parcel 171) | $12,263 | $11,649.85 |
| Lockhart Property (Parcel 287) | $20,700 | $19,665 |
| Joseph Marino Property (Parcel 105) | $19,688 | $18,703.60 |
| City of Covington Property (Parcel 123) | $9,368 | $8,899.60 |
| Leonard Goss, Jr. Property (Parcel 152) | $7,875 | $7,481.25 |

PX 217 at 66-67.

**Defendant Has Not Established That Any Other Errors in Comparable Sales Pricing Require Adjustments to Mr. Hodge's Valuation**

As a claimed second error, Defendant cited comparable sale 1 -- a sale which Mr. Hodge used in the appraisal of six properties encompassing seven parcels. Defendant argues:

For comparable sale 1 on County Line Road, Mr. Hodge looked only at qPublic which lists the property's size as 32 acres (DX 81). The deed shows that 52.28 acres were sold. Id. Using the correct acreage significantly decreases the per acre sales price. But Mr. Hodge did not discover the error in the qPublic information because he did not even review the deed from the sale, much less talk to anyone who could explain the terms of the sale. Tr. 214:4-19; 215:15-25.

ECF No. 264 at 77 (emphasis added).

The qPublic data for the County Line Road sale shows a January 31, 2008 sale of 32 acres at 1710 County Line Road, Mansfield Georgia for $193,700 making the price per acre $6,053, but the warranty deed indicates that this parcel is 52.28 acres. PX 29 at JACKSON 002946; DX 81 at 002. However, the difference in acreage is attributable to the fact that the additional 20.28 acres comprising this parcel was located in an adjoining county, Jasper County, and not listed with Newton County's qPublic data. The sales price for that acreage did not appear on the Newton County database.

As Mr. Hodge explained when Defendant's counsel asked him about the discrepancy in acreage between the qPublic data and the warranty deed for the County Line Road property:

> Yes. I checked on that, with the assessor's office yesterday, after being provided with the deed, and the 32 acres is that portion that's located in Newton County. There is an additional acreage located in Jasper County, and as a result, the $193,700 of the sale price is that portion that's in Newton County. There is an additional acreage <u>for an additional $120,000</u> of property that was located in Jasper County. So qPublic reflects only that portion that was located in Newton County, not the entire transaction.

Tr. 214-15 (emphasis added). In Mr. Hodge's view, this information "shows the accuracy of the assessor's interpretation of the data from Newton County." Tr. 215. Thus, because an additional $120,000 was paid for the Jasper County portion of the property -- the 20.28 acres not listed in Newton County qPublic data -- Mr. Hodge neither understated the total acreage of this comparable nor "significantly overstated" the price per acre. As such, this claimed error does not warrant adjusting Mr. Hodge's appraisals for the six affected properties.

With respect to a claimed third error, Defendant argued:

> For the Highway 11 [comparable] sale, Mr. Hodge listed the amount of land sold as 34.67 acres. The actual acreage was 39. 33 acres, which lowers the price per acre. Mr. Hodge did not investigate to determine why the sale is listed on qPublic as "unqualified." Nor did the fact that the grantor was a bank cause him to question whether the sale was arms-length. DX 82; Tr. 210:12-212:10; 213:2-4.

ECF No. 264 at 76-77. Mr. Hodge used the Highway 11 transaction as one of three comparable sales for his appraisals of six properties: three Category 5 properties and three Category 9 properties. Defendant has not established that the error in acreage so inflated Mr. Hodge's valuation that a reduction in an award of just compensation is warranted. There is no evidence as to why the unqualified designation was listed on qPublic or what the import of the bank being the grantor was on this particular transaction, or what impact these factors may have had on Mr. Hodge's analysis or appraisal.

As a claimed fourth error, Defendant argued:

> Mr. Hodge used comparable sales 55 (50 Tuscany Drive), and 56 (40 Tuscany Drive), in his appraisals of eight properties, relying on qPublic, which shows that both properties sold for $15,500. In fact, sales 55 and 56 were part of a transaction that included the sale of fourteen lots that varied in size from one acre to 1.8 acres. DX 93. The County Appraiser's office just divided the $217,000 sales price for all lots by 14 to arrive at the $15,500 purported sales price for each lot. DX 95 at 95:18-96:3. Given the variation in lot sizes, it is highly unlikely that all fourteen sold for the same price. Moreover, the deed shows that the sale also included common area. DX 93. Because Mr. Hodge did not speak to anyone knowledgeable about the transaction to confirm the sale, he was unaware of the above discrepancies, which clearly indicate that his $15,500 price for sales 55 and 56 is inaccurate. Tr. 577: 9-579:8; 579:15-580:11.

24

ECF No. 264 at 74-75.

None of Defendant's three experts addressed if, or to what extent, these "discrepancies" might warrant a reduction in damages, and the record suggests their impact would be de minimis. The warranty deed executed on April 24, 2009 for the sale of "Lots 1-14, inclusive, of Tuscany Place" to Ms. Nancy Mock shows a real estate transfer sales tax of $217 paid to the clerk of court, denoting a total sales price of $217,000 for all 14 lots, and Mr. Jordan agreed that the individual $15,500 lot prices were reached by dividing $217,000 by 14 lots.  DX 93 at US_0003427; DX 95 at 94-96.  The deed does not show the size of each individual lot -- only a conglomerate area for all 14 lots.  Nor does it show the area attributable to common space.  As such, Defendant has not demonstrated that Mr. Hodge's comparable sales prices for 50 and 40 Tuscany Drive were so flawed as to taint the resulting appraisals.

The remaining four errors that Defendant identified include a sale on Old Atlanta Road which was part of a series of transactions, sales of two properties on Elks Club Road which Defendant contended were not arm's-length transactions, and three sales which were "part of a bulk sale transaction," rendering it unclear "how the individual lot prices were derived."  ECF No. 264 at 75-77.  However, Defendant did not identify any incorrect qPublic data associated with these sales and did not demonstrate how these alleged errors may have impacted the appraisals. As such, the Court does not reduce Mr. Hodge's appraisals based upon these alleged errors.

## Mr. Hodge Properly Considered Adjustments for Market Conditions

Defendant argues that Mr. Hodge's comparable sales analysis is unreliable because he failed to properly adjust comparable sale prices to account for changing market conditions, positing that the Great Recession caused a sharp decline in Newton County housing prices from 2008 to 2012, warranting an adjustment in comparable sale prices to reflect this market shift.  ECF No. 264 at 78-79.

Using the August 19, 2013 date of the NITU issuance as the date of the taking, Mr. Hodge used comparable sales dating from January 2008 to November 2013.  ECF No. 17-3 at 1; PX 217 at 15; ECF No. 265 at 129.  Mr. Hodge considered whether a market conditions adjustment was appropriate, but concluded that it was not, because property values were relatively stable over the time frame represented by the comparable data.  Tr. 180-81, 255; PX 217 at 10.  Mr. Hodge explained:

> [T]here was not a sufficient number of sales that you could actually take a look at and say there has been an increase or decrease [in property values].  We're looking at, you know, the start of 2008, and through mid 2013, we were in the midst of the Great Recession, and, you know, property values, when you look at any kind of a trend during that period of time with the data that I had, there really wasn't any indication that there was significant increase in property values as a result of the passage of time.
>
> So I did not make a market conditions adjustment, but it was considered when I look at how did I come up with my final per-acre value, and, you know, I lean more towards the upper end because as time went on through into '12 and '13, land values had recovered, and even though they hadn't significantly increased, there was at

least some indication in the market that the market was strengthening.  So that was taken into consideration, not with any empirical evidence, but with judgment and analysis of the data that I had available to take a look at.

Tr. 254-55.

Six of the comparable sales Mr. Hodge considered occurred in 2008, with the earliest in January 2008.  ECF No. 265 at 129.  Defendant argues that Mr. Hodge's valuations are unreliable because the 2008 sales occurred at the peak or right after the burst of the housing bubble, and under much different economic conditions than those existing on the date of the taking, August 29, 2013.  Tr. 628; DX 26 at US_0002650.  Citing a chart of Newton County home sales from 1987-2017 prepared by the United States Federal Housing Finance Agency, Defendant's expert economist, Dr. Neuberger, testified: "[y]ou can see dramatic declines in the home price index [from 2008 to 2012].  The bottom is reached in 2012, and there's a slight increase in 2013 as the beginnings of a recovery in housing markets in Newton County started to occur."  Tr. 628; DX 98.  Dr. Neuberger opined that "some of [Mr. Hodge's comparable sales] transactions, many of those transactions, occurred under vastly different economic circumstances than those that prevailed around the time of appraisal date, [August 29, 2013,] and that the failure to make those adjustments reduces and undermines the reliability of Mr. Hodge's appraisals."  Tr. 620; see ECF No. 264 at 79.

As Plaintiffs point out, the United States Federal Housing Finance Agency's chart of Newton County home sales, on which Dr. Neuberger relies, details home prices, and not land prices.  DX 26 at US_0002650; ECF No. 265 at 130.  Dr. Neuberger acknowledged at trial that Mr. Hodge's assignment was valuing land prices, not home prices.  In addition, he agreed that the Housing Finance Agency's chart does not depict all housing sales in Newton County, but only sales based on federally-backed mortgages.  Tr. 635-36, 39.  Dr. Neuberger also acknowledged that the Housing Finance Agency's county-wide chart did not specifically consider "unique" housing markets such as the Covington Historic District.  Tr. 639-40.

At trial, Mr. Hodge explained there "was insufficient data to develop" reliable conclusions about changes in the market conditions because there were relatively few sales in the Newton County and Covington markets.  Tr. 261.  The trial testimony of Plaintiff-landowner Mr. Dew supports Mr. Hodge's conclusion about the scarcity of comparable sales data, especially for homes in Covington's Historic District.  Mr. Dew testified that "there's been a few [houses in the Historic District] that sold and others haven't sold in 100 years."  Tr. 33.

The Court finds that Mr. Hodge reasonably concluded that the data did not support making adjustments for market conditions.  See PX 217 at 15; see also Tr. 732 (Matthews stating "I can see where an appraiser could convince himself that [making no adjustments] would be the best way to handle it, because there's not enough data to prove one way or the other.").  As stated in J.D. Eaton's Real Estate Valuation In Litigation, though appraisers must consider whether adjustments are necessary, they are not required to make such adjustments if the appraiser deems it inappropriate based on his study of the market.  See REAL ESTATE VALUATION IN LITIGATION 208 (2d ed. 1995); PX 217 at 10, 15; Tr. 254-55.

Based on the record as a whole, the Court adopts the valuations of Plaintiffs' expert, Mr. Hodge, adjusting his appraisals of the 10 properties using 9159/9169 Malcolm as a comparable sale downward by 5%.

**Damages to the Remainder**

In addition to the value of the property actually taken, just compensation for a Fifth Amendment taking includes severance damages for any diminution in value to the owner's remaining property resulting from the taking.  <u>Hendler v. United States</u>, 175 F.3d 1374, 1383 (Fed. Cir. 1999).

Both experts agree that a "paired-sales analysis" is the preferred approach to determine any diminution in value to the remainder.  <u>See</u> PX 217 at 11; DX 94 at 21, 164; 176; Tr. 296 (Hodge) ("[P]aired sales are basically you're looking at two sales with one significant difference between the two sales that you can measure.").  Mr. Hodge found that there was insufficient market data on comparable properties to conduct a valid paired sales analysis with respect to the remainder properties.  Tr. 190; PX 217 at 11-12.  Instead, he considered the "changes in the use and utility of the remaining property" and made individual determinations of the diminution in value of the remainder properties based on the properties' "specific and unique characteristics."  <u>Id.</u> at 12.

Mr. Hodge elaborated with respect to his appraisal of the property of Mr. Dew:

MR. HEARNE (COUNSEL FOR PLAINTIFFS):    And, so . . . you concluded that there was also a diminution in value of the remainder, correct?

MR. HODGE: That is correct.  And that's reflected in the 15-cent per square foot difference in the value before and after.

THE COURT: And that would be the difference in the value of the property that remainder, the 50,000 square foot property that remained?

MR. HODGE: That is correct, yes.

Tr. 318-319.  Due to the "loss in site area and the impact of having a public trail adjacent to the property," Mr. Hodge found that Mr. Dew's remainder property had decreased in value by $7,586.  DX 5 at JACKSON 001195; PX 217 at 46.

In analyzing the effect of the trail easement on the remainder value of different properties, Mr. Hodge divided the properties into nine categories:

| | |
|---|---|
| Category 1: | Residential Property in Covington's Historic Downtown |
| Category 2: | Residential Property in Covington, but outside of Historic Downtown |
| Category 3: | Residential Property outside of Covington |
| Category 4: | Rural Residential Improved |
| Category 5: | Rural Residential Vacant Land |
| Category 6: | Residential Property in Newborn and Mansfield |
| Category 7: | Commercial Property as Improved |
| Category 8: | Commercial Property as Vacant |
| Category 9: | Agricultural Property |

PX 217 at 3.  For all these categories of properties, Mr. Hodge:

determined the percentage valuation by taking into account a variety of factors,

27

including the proximity of the easement to the home, privacy and security concerns, the topography of the property in relation to the easement, the necessity to fence, berm, or buffer the private space from the public space, and the increased access the general public has to the property by reason of the rail-trail corridor easement.

PX 217 at 15.  Mr. Hodge also considered "loss of access [to a public road], and the potential for increased vandalism," which could "diminish the desirability and marketability of the property." Id. at 11.

The majority of Mr. Hodge's individual assessments of damage to the remainder range from 2-45% of the subject property's "before" value: 6-14% for residential properties, 9-26% for improved commercial properties, 2-45% for vacant commercial properties, and 2-45% for agricultural properties.  PX 217 at 15, 18, 36, 39, 41.  There are, however, three outlier properties where values decreased more dramatically: Parcels 57, 123, and 187.  Mr. Hodge found that the value of Plaintiff Thorpe's property, Parcel 57 had decreased by 60%; that the City of Covington's property, Parcel 123, had decreased by 82%; and that Plaintiff Betty Pickens' property, Parcel 187, had decreased by 74%.  PX 217 at 15, 18, 20, 44.

Mr. Hodge singled out the deleterious impact to properties bisected by the trail, such as the Thorpe property, Parcel 57:

Jennifer Thorpe's home was unique because the easement takes a sharp turn south and travels over her property bisecting it into two separated parcels. The imposition of the rail-trail corridor easement substantially reduced the value of Jennifer Thorpe's remaining property.  The easement brings the general public to within a few feet of her home and bisects her backyard.  A buyer of the Thorpe property would likely give no value to the triangular section on the opposite side of the easement, as there would be no access to it directly from the home or yard without crossing the rail-trail corridor. And, if the buyer wished to fence the public space from the private space, it would further render the southwest corner of Ms. Thorpe's lot completely inaccessible for use as part of the residential yard.

Id. at 15.

Plaintiff Thorpe's property is depicted below:



DX 17C at US_00003178.  Mr. Hodge found that the value of the Thorpe property was diminished by 60 percent because "the rail-trail corridor easement bisected her property causing her to lose the use of most of her backyard and the existing access from Butler Avenue."  PX 217 at 15.

Mr. Hodge found similar diminution in value to the remainder of Ms. Dixon's property, Parcel 186, reasoning:

> Ms. Dixon's property also suffered severance damages because of the same need to cross the easement in order to access a portion of her property. Ms. Dixon has six acres of property that is only accessible by crossing the trail. These six acres are unimproved and had a highest and best use as agricultural land in August 2013. However, without documented access to those six acres, it is my opinion that a knowledgeable buyer in August 2013 would have paid about half the market value of those six acres because of the lack of any guaranteed unlimited and perpetual access over the easement.

PX 217 at 43.

Mr. Hodge determined that Plaintiff Betty Pickens' property, Parcel 187, had decreased in value by 74%.  PX 217 at 44.  Parcel 187 is now accessible only by crossing the trail easement from the public road.  Id. at 43-44.  As Mr. Hodge states in his report, "[i]n the 'before' scenario, Ms. Pickens would not have to worry about her access off of County Road 213 to her residence, nor would any prospective buyer of the property."  Id. at 44.  After the taking, however, the Trail bisects the majority of her property, where the residence is, from the access point where the property touches County Road 213.  Thus, she cannot guarantee to a potential buyer any access

from the property to County Road 213 without having to cross the Trail due to the taking.  The Pickens property is depicted below:



PX 29 at JACKSON 002938.

With respect to the City of Covington's property, Parcel 123, Mr. Hodge determined that the value of the remainder was diminished by 82 percent.  The trail easement bisects Parcels 57 and 187, and separates Parcel 123 from residential properties which could have potentially acquired it to enlarge their own properties.  Id. at 16, 20; PX 29 at JACKSON 002910.  Mr. Hodge noted that "[d]ue to the lack of access crossing the subject property the southern portion of the site will no longer be able to be assembled to the adjacent parcels to the west."  PX 43 at JACKSON 004143.  He explained: "The City of Covington's property (123), shown below, loses substantial value because in the "before" condition it would have been desirable to assemble with the homes and properties on the other side of the right-of-way. After the taking, the parcel loses much of its value."  Id. at 20.

30



JACKSON 004185

Id. at 20.

Defendant raises several challenges to Mr. Hodge's calculations of damages to the remainder. First, Defendant argues that Mr. Hodge did not support his findings with sales evidence or other empirical data, or conduct a "study to show causation of damages from proximity to the trail." ECF No. 264 at 21, 64-69, 72-73; ECF No. 303 at 63-66. Mr. Hodge acknowledged that a paired-sales analysis is "the preferred approach to estimate the diminished value of the remainder parcel due to the effect of the easement." PX 217 at 11. Mr. Hodge "looked for [comparable] sales," but there was "such a limited amount of data available in Newton County for all of these different property types that it was impossible to do an accurate paired sales analysis." Tr. 190, 227.

Mr. Hodge explained:

The preferred approach to estimate the diminished value of the remainder parcel due to the effect of the easement would be a paired-sales analysis. But a paired-sales analysis is only valid if there are a sufficient number of comparable properties with similar characteristics sufficient to isolate the effect of the presence of the rail-

trail corridor on the value of the property, as opposed to other differences between the properties. To be valid a paired-sales analysis one must have a sufficient number of arms-length sales of properties that are sufficiently similar. I conducted extensive research to find sales of a sufficient type and character that could provide a basis to prepare a valid paired-sales analysis. There were not, however, sufficient sales of sufficiently similar properties to conduct a valid paired-sales study. There have been studies completed which, in my mind, are inconclusive. Some of the studies completed indicate some benefit to property values and others show significant diminution in value, particularly for properties that are adjacent to the corridor. As a result, rather than attempting to empirically quantify the loss in value I have looked at the issue from a more common sense, rather than empirical, recognizing that a property along the corridor would be negatively affected due to the impact of the placement of an easement across the property.

PX 217 at 11-12.

Mr. Hodge's conclusion that there were insufficient comparable sales to perform a valid paired-sales analysis to determine severance damages is supported by both his own and Mr. Sheppard's data. Mr. Sheppard also cited the "scarcity of truly comparable data, due to the rural/suburban nature of the area and especially in light of a period of low sales volume after the Great Recession." DX 94 at 21. The Court finds that in this situation where there is a dearth of appropriate comparable sales data, Mr. Hodge's "common sense" approach of assessing changes in the use and utility of individual remainder properties was reasonable and supported by the record. Mr. Hodge considered both the physical changes to the remainder post taking and credible landowner concerns about trespass, loss of privacy, increased noise and traffic, and dumping and wildfires and lack of security. Id. at 141.[21]  Tr. 39, 41, 56, 81, 105, 119-20. One Plaintiff, James W. Johnson, became emotional when testifying about the negative changes wrought by the trail easement on his property. Tr. 74-75; 105-06. The Court found this witness credible and his concerns, genuinely held.[22]

Defendant claims that Mr. Hodge failed to support his finding that the trail easement impeded access to the Pickens and the Mocks' property. ECF No. 264 at 70-71; ECF No. 303 at

---

[21]    Mr. Hodge met directly with 26 landowners and their representatives and conducted one telephonic interview. Tr. 174; PX 217 at 14, 17, 25, 31, 35, 37-38, 40.

[22]    The Court recognizes that a witness, Mr. Lamar Maurice Carter, expressed a contrary view of the Trail and testified that the idea of a trail was appealing for him because his friends could come and visit from the trail and it made him happy to watch the people walking by. Tr. 373, 377. Mr. Carter additionally testified that he preferred the idea of a trail to the train, he did not have security concerns, and he and his wife used the building of the trail as an opportunity to fix their wall that was in disrepair and build windows into the wall to look out onto the trail. Tr. 360-62, 364-65, 372-73, 376. The Court finds that this witness's positive view of the trail must be viewed in the context of his leadership and support of the construction of the trail. Mr. Carter served as the Chair of the Newton County Trail Path Foundation, the easement-holder in this case, from 2009-2013, donated money for the trail's construction and testified that he is "kind of proud" of the trail. Tr. 352-54, 373.

66-67.  However, Mr. Hodge's finding that the Mocks and Ms. Pickens must cross the easement to access their properties is borne out by the record.  PX 29 at JACKSON 002897; PX 38 at JACKSON 003776.  As depicted below, the trail easement divides Parcel 276, owned by Plaintiffs Ricky and Nancy Mock, from the public road, Highway 213:



PX 38 at JACKSON 003812.

In his appraisal report for the Mocks' property, Parcel 276, Mr. Hodge stated that the easement runs "between the subject property and Highway 213, effectively diminishing any access potential from Highway 213 onto the subject property."  Id. at JACKSON 003776, 88.  Mr. Hodge determined that "[d]ue to the inability to cross the former railroad [right-of-way], access to the property from Hwy. 213 has been eliminated."  Id. at JACKSON 003779.  He concluded that the Mocks' property was diminished in value by 14% due to the loss of land area and frontage access along Hwy. 213.  Id. at JACKSON 003809.

Defendant makes the curious suggestion that the Mocks could access their property by walking or driving across the trail from Highway 213, arguing:

> Under Georgia law, the owner of a servient estate can make any use of the easement that does not prevent the easement's use . . . . Thus, as a matter of law, so long as crossing the trail does not preclude public trail use, it is permissible.  And there is, of course, no evidence that walking or driving across the trail prevents its use as a walking/biking trail.

ECF No. 264 at 70.  Defendant does not, however, dispute Mr. Hodge's finding that the Mocks

and Mrs. Pickens must cross the easement to access their properties.  There is no suggestion that these landowners had vehicular crossing rights over the Trail.  As such, the Court credits Mr. Hodge's opinion that a reasonable buyer would be concerned about having to cross a trail easement to access these properties**.**

Defendant also faults Mr. Hodge for not analyzing the "cost to cure" the detriments resulting from the trail easement, such as erecting fences to compensate for loss of privacy or installing security cameras to counter increased vandalism.  ECF No. 264 at 71-72.  The cost to cure—or the cost of mitigating damages caused by the taking—provides an alternative means of quantifying severance damages, "[w]hen the cost of curing the injury to the remainder is less than the outright diminution in its value uncured."  United States v. 2.33 Acres of Land, 704 F.2d 728, 730 (4th Cir. 1983) (citing United States v. Dickinson, 152 F.2d 865, 870 (4th Cir.1946), aff'd, 331 U.S. 745, 67 (1947)); Julius L. Sackman, Nichols on Eminent Domain § 14A.04[2][a] (3d ed. 2013).  There is, however, no persuasive evidence in the record on what the cost to cure would have been in the event any damages to the remainder were deemed appropriate and no showing whether the cost to cure would have been less than the diminution in value to the remainder.  As such, Defendant has failed to establish that Mr. Hodge's expert opinion is flawed because he failed to offer an opinion on the cost to cure.

## Defendant's Expert's Opinion that Adjacency to the Trail Increased the Value of 22 Properties

Mr. Sheppard conducted a paired sales analysis to determine any damages or benefit to the remainder property, using sales from "other trails in Newton County and in surrounding submarkets throughout Georgia."  DX 94 at 21, 164.  He looked at several subdivisions along other trails in the area and concluded "that the trail corridor likely commands a negligible/small premium in certain instances, but not a discount" and opined that buyers paid between $5,000-$5,800 more for residential properties "abutting trails in Newton County."  DX 94 at 155-57, 164, 168.

Mr. Sheppard referenced three sales of side by side, similar-sized homes in the Highgrove subdivision in Newton County, Georgia: 10, 30, and 40 Fernhill Court, to opine that "a $5,000± premium was paid for a home, due solely to its proximity to the concrete-paved Eastside Trail." Id. at 157.  Mr. Matthews found that "the overall impact of the trail being hidden by trees," the lot not actually abutting the Eastside Trail and its location on a curve "would diminish any influence of the trail [on] the lot's value in this specific case."  PX 144.17 at JACKSON 004730.  Mr. Sheppard admits that none of the Fernhill Court properties are directly abutting the trail.  See Tr. 489-90; DX 21 at US_0002773.  In the Court's view, the Fernhill Court properties are not sufficiently analogous to provide a useful comparison, as those properties did not abut the trail were buffered from the trail by some woods and thus did not raise the same negative concerns as the subject properties.  See id. at US_0002774; see also Hardy v. United States, 141 Fed. Cl. 1, 26 (2018).

In addition to the Fernhill Court properties, Mr. Sheppard analyzed 30 residential home sales fronting the subject corridor in Newton County, between May 1, 2013 and December 7, 2016, as well as sales of 12 homes in Brookline subdivision in Newton County, which fronted the trail corridor and of nine homes which did not.  DX 94 at 154, 159-60.  Based on these sales, Mr. Sheppard concluded that the average Brookline home off the subject corridor sold for $11.01 per square foot less than the average Brookline home on the corridor which equated to "an $18,563

premium for abutting the subject corridor – prior to considering time aspects." <u>Id.</u> at 160.  In his market adjustment for the Brookline properties, Mr. Sheppard found that properties on the trail corridor commanded "a premium of $15,000 for the whole property," and reduced that premium due to "the woods-view aspect . . . leading to [an] estimate that a $5,000±premium was attributable to the underlying land." <u>Id.</u> at 160-61.  The Court finds Mr. Sheppard's comparable sales analysis unpersuasive.  All but two of the sales he identified occurred after the August 19, 2013 date of the taking, and all the sales occurred before a portion of the trail was paved in March 2017.  <u>See id.</u> at 158, 160; PX 144.17 at JACKSON 004730-32.  Such sales fail to aid in determining the impact of the trail on the value of the subject remainder properties.

Importantly, there is an overarching problem with Mr. Sheppard's finding that no remainder property decreased in value at all as a result of the trail easement.  DX 94 at 188-209.  In so opining, Mr. Sheppard ignored loss of privacy, accessibility, and increased security concerns Plaintiffs suffered due to the trail.  Mr. Sheppard did not include individual assessments of the impact of loss of privacy, noise, trash, and security issues.  <u>See, e.g.</u>, <u>id.</u> at 167; <u>see</u> Tr. 425-26.  Mr. Sheppard's opinion particularly strains credulity with respect to Plaintiff Jennifer Thorpe's property where the trail easement bisects the property.  Mr. Sheppard found that the "before" value of the property was $11,441.  DX 17C at US_0003188.  Due to the $5,000 "special benefit" resulting from the property's trail frontage, Mr. Sheppard found that the Thorpe property increased in value by $2,840 due to the taking and has an "after" value of $14,281.  <u>Id.</u> at US_0003170-71; <u>see also</u> Tr. 695-97.

Mr. Sheppard applied this identical $5,000 "special benefit" to 22 remainder properties with "direct access and frontage" on the trail.  DX 94 at 157, 200.  For each of these 22 properties, Mr. Sheppard found that this $5,000 increase in the value of the remainder exceeded the lost value of the property's encumbered land, that all 22 properties had a net increase in value due to the imposition of the trail easement, and that the owners were entitled to no compensation.  <u>Id.</u> at 200-09.

Mr. Sheppard's conclusion that the trail creates a substantial benefit to an adjacent home's value is not supported by the record.  Based upon the record as a whole, the Court credits Mr. Hodge's analysis of the damages to the remainder properties, not Mr. Sheppard's.

## <u>The Appropriate Interest Rate</u>

Also pending before the Court are the parties' cross-motions for partial summary judgment as to the appropriate interest rate to provide Plaintiffs just compensation.  Plaintiffs argue that Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's rate") should be applied because it provides a reliable indicator of the rate of return that a "prudent investor" would obtain.  ECF No. 162 at 4.  Defendant contends that the interest rate prescribed in the Declaration of Takings Act ("DTA") would appropriately compensate Plaintiffs for the delay in payment of just compensation.  ECF No. 178 at 7.  For the reasons explained below, the Court applies Moody's rate to calculate delay damages in this case.

The Fifth Amendment mandates that the federal Government pay just compensation when it takes private property for public use.  U.S. CONST. amend. V; <u>United States v. Miller</u>, 317 U.S. 369, 373 (1943).  Just compensation is generally determined by "the fair market value of the property on the date it is appropriated."  <u>Kirby Forest Indus., Inc. v. United States</u>, 467 U.S. 1, 10

(1984). In cases where significant time has elapsed between the date of the taking and payment of just compensation, the Government must apply a sufficient interest rate to put plaintiffs in the same position as though just compensation had been paid contemporaneously with the taking. See Tulare Lake Basin Water Storage Dist. v. United States, 61 Fed. Cl. 624, 627 (2004) (citing Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306 (1923)). As the Supreme Court has explained:

> If the Government pays the owner before or at the time the property is taken, no interest is due on the award . . . But if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.

Kirby Forest, 467 U.S. at 10 (internal quotations and citations omitted); ITT Corp. v. United States, 17 Cl. Ct. 199, 240 (1989) (stating that "[f]ull compensation, then, requires that a [property owner] whose award has been delayed be compensated for his inability to utilize his money.")

In fashioning an award of just compensation, the appropriate inquiry is what has the owner lost, not what has the taker gained. Bos. Chamber of Com. v. City of Boston, 217 U.S. 189, 195 (1910). The Prudent Investor Rule, a guideline to determine what landowners lost by not having the use of funds between the date of taking and the date of payment, calculates the appropriate interest rate "not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how 'a reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining safety of principal.'" Tulare, 61 Fed. Cl. at 627 (quoting United States v. 429.59 Acres of Land, 612 F.2d 459, 464-65 (9th Cir. 1980).

As Plaintiffs argue, Moody's rate "provides a consistent, reliable indicator of the rate of return that would be obtained by a 'prudent investor' given the economic circumstances prevailing during the time between when their property was taken and when the government finally pays them." ECF No. 162 at 4 (citing Miller v. United States, 620 F.2d 712 (Ct. Cl. 1980); Pitcairn v. United States, 547 F.2d 1106 (Ct. Cl. 1976); Tektronic, Inc. v. United States, 575 F.2d 832 (Ct. Cl. 1978), cert. denied, 439 U.S. 1048; Ga. Pac. v. United States, 640 F.2d 328 (Ct. Cl. 1980)). "[T]his court has already recognized the Moody's Index as 'an indicator of broad trends and relative levels of investment yields or interest rates' and as an instrument that 'cover[s] the broadest segment of the interest rate spectrum.'" Sears v. United States, 124 Fed. Cl. 730, 736 (2016) (quoting Pitcairn, 547 F.2d at 1124).

Defendant contends that Moody's rate would provide Plaintiffs an inappropriate windfall and urges the Court to apply the statutory interest rates in the Declaration of Takings Act ("DTA"), 40 U.S.C. § 3116. ECF No. 178 at 1. Defendant argues that the statutory rate set forth in the DTA applies in direct condemnations and that this same rate should be applied in inverse condemnation cases. There are, however, two critical distinctions between direct and inverse condemnation proceedings that make the DTA rate inadequate for Rails-to-Trails cases. First, in inverse condemnation situations, there is often a much longer time period between the taking of the landowner's property and the payment of just compensation. See generally United States v. Clarke, 445 U.S. 253, 257 (1980). In an inverse condemnation action, the landowner is "an involuntary lender to a debtor he would often prefer not to have," and "the risk of any difference between the rates the government would normally pay, and those the condemnee could have

achieved by prudent participation in the broader market, should fall on the former." Tulare, 61 Fed. Cl. at 630 (citing Redevelopment Agency v. Gilmore, 38 Cal. 3d 790 (1985) and Miller, 620 F.2d at 839). "The DTA, which was enacted to give the government 'immediate possession' of property while providing 'immediate cash compensation' to the former owner . . . does not contemplate such delays." Tech. Coll. of the Low Country v. United States, 147 Fed. Cl. 364, 369 (2020) (citing United States v. Miller, 317 U.S. 369, 381 (1943)). It is during this intervening time that the landowner "faces a loss of liquidity foreign to the direct condemnation process." Id.

Second, "the DTA rate contemplates an award of just compensation from the perspective of the government's cost of borrowing rather than the perspective of the claimant's rate of return." Id. (citing Tulare, 61 Fed. Cl. at 630) (internal quotation marks omitted); see Oral Arg. Tr. 37-38. But "[t]his [gain-to-the-Government] approach is improper -- in fact, just compensation requires the exact opposite" -- determining what the landowner has lost. Tech. Coll. of the Low Country, 147 Fed. Cl. at 369; see generally Sears, 124 Fed. Cl. at 734 n.3 (stating that the Declaration of Taking Act applies to condemnation cases and that its "provisions are not binding on other types of Fifth Amendment takings cases, such as the present rails-to-trails case." (internal citations omitted)).

The majority of recent Court of Federal Claims decisions have applied the Prudent Investor Rule and Moody's rate in fashioning the proper interest rate necessary to achieve just compensation. See, e.g., Ideker Farms, Inc. v. United States, 151 Fed. Cl. 560, 608-10 (Fed. Cl. 2020) (using the Prudent Investor Rule as a "guiding principle" and finding that Moody's rate is the appropriate measure of interest); Tech. Coll. of the Low Country, 147 Fed. Cl. at 367-68 (finding that the Prudent Investor Rule applies and Moody's rate properly measures damages); Hardy v. United States, 138 Fed. Cl. at 357; Love Terminal Partners v. United States, 126 Fed. Cl. 389, 439 (2016), rev'd on other grounds, 889 F.3d 1331 (Fed. Cir. 2018); Sears, 124 Fed. Cl. at 736-37. The Prudent Investor Rule also promotes establishing a uniform rate of interest applicable to condemnation cases and avoids discrimination among litigants. Tech. Coll. of the Low Country, 147 Fed. Cl. at 367 (citing Miller, 620 F.2d at 838.).[23]

Finally, Plaintiffs argue that just compensation requires annual compounding because Plaintiffs would have been able to earn compound interest if they had been paid at the time of the taking. While "compound interest ordinarily does not run against the government without its consent, this prohibition on [compound] interest against the government does not apply in fifth amendment takings cases." Bowles v. United States, 31 Fed. Cl. 37, 52 (1994) (citing Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411, 414-15 (1994)).

In cases with a long delay since the date of the taking, "the award of compound interest is

---

[23]    This Court recognizes that the DTA rate has been applied in a few recent inverse condemnation decisions. E.g. Liebman v. United States, 139 Fed. Cl. 653, 664 (2018) (applying the DTA because "[n]either party provided an argument for the use of a particular interest rate"); Waverly View Invs., LLC v. United States, 136 Fed. Cl. 593, 596-97 (2018); St. Bernard Parish Gov. v. United States, 126 Fed. Cl. 707, 728 (2016), rev'd on other grounds, 887 F.3d 1354 (2018); Textainer Equip. Mgmt. Ltd v. United States, 99 Fed. Cl. 211, 223 (2011) (applying the DTA rate because plaintiffs had presented no evidence supporting the application of Moody's rate). However, this Court finds that Moody's rate better achieves the goal of arriving at just compensation for landowners.

not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution." Whitney Benefits, 30 Fed. Cl. at 415; see also Ideker Farms, 151 Fed. Cl. at 609 (compounding interest annually); Biery v. United States, Nos. 07-693L and 07-675L, 2012 WL 5914521, at *4 (Fed. Cl. Nov. 27, 2012) (finding that compounding annually "may be necessary to accomplish completed justice under the Just Compensation Clause (internal quotation marks omitted)); Textainer Equip. Mgmt. Ltd. v. United States, No. 08-610C, 2014 WL 2938452, at *3 (Fed. Cl. June 30, 2014) (applying Moody's rate compounded annually).  The delay in Plaintiffs' compensation for the 2013 taking entitles these Plaintiffs to interest compounded annually.

## Conclusion

The Court adopts the valuations of Plaintiffs' expert, Mr. Hodge, with the reductions noted above, and awards just compensation as shown in the Table in Appendix I.

Plaintiffs are entitled to interest representing delay damages between the date of the taking and the date of payment at an interest rate equivalent to the Moody's rate, compounded annually. Accordingly, the Court **GRANTS** Plaintiffs' motion for partial summary judgment and **DENIES** Defendant's cross-motion.

The parties shall file a joint status report by **September 30, 2021**, proposing the judgment that should be entered in this case pursuant to Rule 54(b). The parties shall specify how much of the proposed amount is attributable to delay damages, assuming the judgment will be paid on **October 29, 2021**. Additionally, the parties shall indicate the specific numerical interest rate that applies for future delay damages, if any, beyond October 29, 2021.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**

## Appendix I

| Claim ID | Full Name | Land within the Easement Damages | Severance Damages to the Remainder | Total Award |
|---|---|---|---|---|
| 140 | Alcantara, David | $3,967 | $2,898 | $6,865 |
| 168 | Alcide, Sheylah | $9,618.75 | $4,774 | $14,392.75 |
| 47 | Carter, Gail W. | $3,017 | $1,761 | $4,778 |
| 175 177 | Castleberry, Lester M. and Connie M. | $3,063 | $3,422 | $6,485 |
| 123 | City of Covington | $8.899.60 | $54,775 | $63,674.60 |
| 141 | City of Covington | $10,120.50 | $8,695 | $18,815.50 |
| 34 | City of Covington | $47,073 | $27,770 | $74,842 |
| 35 | City of Covington | $21,175 | $5,499 | $26,674 |
| 55 | City of Covington | $3,620 | $7,406 | $11,025 |
| 7 | Clark's Grove, LLC | $83,490 | $64,293 | $147,783 |
| 202 | Crawford, William R., III and Patricia E. | $2,360 | $1,355 | $3,715 |
| 44 | Dew, Robert C., Jr. and Pamela M. | $4,023 | $7,586 | $11,609 |
| 186 | Dixon, Mary Jane | $15,398 | $73,944 | $89,342 |
| 42 | Faulkner, Robert L., Jr. | $3,915 | $8,053 | $11,968 |
| 36 38 | First Baptist Church of Covington | $22,380 | $37,741 | $60,121 |

## Appendix I

| Claim ID | Full Name | Land within the Easement Damages | Severance Damages to the Remainder | Total Award |
|---|---|---|---|---|
| 37 | First Baptist Church of Covington | $18,076 | $3,267 | $21,343 |
| 284 | Fowler Newton Properties, LLC | $22,068 | 0 | $22,068 |
| 152 | Goss, Leonard, Jr. | $7,481.25 | $1,701 | $9,182.25 |
| 61 | Gossett Properties, LLC | $4,752 | $2,483 | $7,235 |
| 41 | Greyland Real Estate Investments | $2,850 | $1,930 | $4,780 |
| 43 | Greyland Real Estate Investments | $6,777 | $4,547 | $11,324 |
| 115 | Guenther, Mark Frederick | $3,300 | $4,965 | $8,265 |
| 197 | Hackett, Ricky Joe and Phyllis S. | $945 | $5,035 | $5,980 |
| 188 | Hankins, Wendy M and Robert L. | $3,379 | $1,186 | $4,565 |
| 142 | Hay, Sam B., Jr. and Dearing, John J. | $12,781 | $49,252 | $62,033 |
| 125 | Henry, Reginald F. and Yvonne I. | $16,910 | $5,314 | $22,224 |
| 45 | Hooten, Dennis R. and Judy M. | $2,685 | $1,413 | $4,098 |
| 88 | Huguelet, Marcia A. | $5,888 | $3,354 | $9,241 |

**Appendix I**

| Claim ID | Full Name | Land within the Easement Damages | Severance Damages to the Remainder | Total Award |
|---|---|---|---|---|
| 184 | Johnson, James W. | $12,798 | $15,810 | $28,608 |
| 28 | Jones, Bradford and Robert | $4,760 | $1,765 | $6,525 |
| 236 | Jones, Catherine Ann | $1,776 | $1,204 | $2,980 |
| 196 | Karen James d/b/a Windy Hill Tree Farm | $6,272 | $4,588 | $10,860 |
| 287 | Lockhart, Larry and Collete B. | $19,665 | $5,787 | $25,452 |
| 239 | Lunsford, Perry Charles | $1,030 | $1,395 | $2,425 |
| 105 | Marino, Joseph J. | $18,703.60 | $4,973 | $23,676.60 |
| 135 | Mastin, Willard | $1,012 | $1,900 | $2,912 |
| 275 276 277 | Mock, Ricky and Nancy | $9,608 | $72,885 | $82,565 |
| 216 | Mock, W.D. Ballard and Nancy | $2,764 | $2,936 | $5,700 |
| 162 | Munroe, Winston and Patricia | $10,901.25 | $3,414 | $14,315.25 |
| 210 211 | Newton County Board of Commissioners | $7,965 | $11,646 | $19,611 |
| 124 | Newton County Board of Commissioners | $5,184 | $13,010 | $18,194 |
| 276 | Newton County Board of Commissioners | $20,025 | $24,307 | $44,332 |

41

**Appendix I**

| | Full Name | Land within the Easement Damages | Severance Damages to the Remainder | Total Award |
|---|---|---|---|---|
| 182 183 | Newton County Board of Commissioners | $9,856 | $30,848 | $40,704 |
| 187 | Pickens, Betty Jean | $15,613.20 | $88,013 | $103,626.20 |
| 280 | Pulliam, Elaine H. | $15,745 | $5,651 | $21,396 |
| 164 | Rentrope, Jacinda M. | $11,115 | $3,386 | $14,501 |
| 54 | Restivo, John, III and Marion | $6,042 | $4,051 | $10,093 |
| 285 | Robin Fowler Properties | $4,936 | $981 | $5,917 |
| 29 286 | Robin Fowler Properties | $12,999 | $7,188 | $20,187 |
| 171 | Semador, Isaac | $11,649.85 | $3,658 | $15,307.85 |
| 155 | Smith, A. Randall and Katherine P. | $1,085 | $940 | $2,025 |
| 132 | Smith, Sherman E. | $24,415 | $4,396 | $28,811 |
| 48 | Stone, Edward Phillip | $2,613 | $5,141 | $7,753 |
| 68 | Tabb, Robert Y. and Darcel K. | $6,413 | $2,152 | $8,564 |
| 57 | Thorpe, Jennifer H. | $4,161 | $11,713 | $15,874 |
| 25 | ULKAFAW Corporation | $10,125 | $14,288 | $24,413 |

**Appendix I**

| Claim ID | Full Name | Land within the Easement Damages | Severance Damages to the Remainder | Total Award |
|---|---|---|---|---|
| **288** | **ULKAFAW Corporation** | $10,072 | $25,184 | $35,256 |
| **193** | **Zenko, Robert M.** | $1,332 | $2,663 | $3,995 |